IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| WALNUT HILLS-GREENVILLE AVE, LLC, | § | Case No. 24-31485 |
| | § | |
| Debtor. | § | |
| | § | |

**UNITED TEXAS BANK'S MOTION FOR ORDER APPOINTING EXAMINER**

---

**Negative Notice – BLR 9013-1(b)**

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

---

United Texas Bank ("UTB"), as the Debtor's prepetition secured lender, files this Motion (the "Motion"), pursuant to section 1104(c) of title 11 of the United States Code (the "Bankruptcy Code") and rule 2007.1(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and hereby requests entry of an order directing the appointment of an examiner to investigate the affairs of the above-captioned debtor (the "Debtor").  In support hereof, UTB respectfully states as follows:

**PRELIMINARY STATEMENT**

1. This is a single asset real estate case concerning a commercial office building located at 7502 Greenville Avenue, Dallas, Texas 75231, on the northeast corner of Greenville Avenue and Walnut Hill Lane in Dallas, Texas (the "Property").  UTB loaned the Debtor $25 million in March 2022, secured by a first-lien Deed of Trust on the Property.  The Debtor filed this bankruptcy case on April 1, 2024, ostensibly for the sole purpose of thwarting UTB's foreclosure sale scheduled for the following day.

2. The Debtor leases the entire Property to an insider Tenant (defined below) for base rent of $290,474 per month.  Tenant's financial statements show that it only paid the Debtor a total of $108,057 in rent during the four months spanning from September 2023 through December 2023.  Inexplicably however, the Debtor's financial statements show that the Debtor received all $1,161,896 of the base rent tenant owed during that same time-period.  Even more troubling is the fact that the Debtor and its master Tenant are both controlled by the same person, Dr. Atul Lucky Chopra, and the same CPA prepared the financial statements for both entities.

3. In addition, the Debtor has failed to pay any ad valorem taxes on the Property for two years, despite reporting net income of approximately $1.9 million in 2023.  These unpaid property taxes diminish the value of UTB's collateral dollar-for-dollar by the amount of Dallas County's statutory tax liens, because statutory tax liens take priority over UTB's Deed of Trust under Texas law.  Given the Debtor's reported annual net income, the Debtor should have had sufficient cash flow to satisfy all ad valorem tax claims as they came due.  Moreover, under the Debtor's lease with its insider Tenant, the Tenant has a contractual obligation to satisfy ad valorem property taxes.  UTB fears that the Debtor is: (i) not enforcing its lease with its Tenant because of the Tenant's insider status; (ii) not providing UTB with accurate financial reporting; and (iii) using

its purported $1.9 million of annual net income for the benefit of insiders instead of paying its tax obligations as they come due.

4. It is also disturbing that it has taken Debtor more than 2 months to open a Debtor in possession account. During that time, Debtor's funds were being held in an account owned and controlled by the insider Tenant. *See* Debtor's Monthly Operating Reports (Dkts. 27 and 30).

5. Accordingly, UTB seeks the appointment of an examiner under section 1104(c) of the Bankruptcy Code to investigate the Debtor's operations and financial affairs, as further set forth herein.

## JURISDICTION AND VENUE

6. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A). UTB consents to the Court's entry of a final judgment on this matter to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments on this matter consistent with Article III of the United States Constitution.

7. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

8. On April 1, 2024 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues in possession of its property and manages its business as a debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code. No official committees have been formed in this case, and no trustee has been appointed.

9. The Debtor filed its Bankruptcy Schedules A-H [Dkt. No. 17] (the "Schedules") and Statement of Financial Affairs [Dkt. No. 17] (the "SOFA") on April 11, 2024.

10. The Debtor's Property constitutes single asset real estate ("SARE"), as defined in section 101(51B) of the Bankruptcy Code. *See* Dkt. No. 1. The only assets listed in the Debtor's Schedules are the Property and two bank accounts maintained at UTB, each with $0.00 balances.

A. **UTB'S $25,000,000 FIRST-LIEN LOAN**

11. The Debtor acquired the Property on or around November 2, 2020.[1]

12. On or about March 16, 2022, the Debtor refinanced the Property with a loan from UTB in the original principal amount of $25,000,000 (the "Loan"). The Loan is secured by a valid and properly perfected first-priority lien and security interest on the Property and other assets of the Debtor. The Loan and UTB's liens are evidenced by the following documents attached hereto as **Exhibits A–E** (together with all other documents evidencing, securing, or otherwise relating to the Loan, the "Loan Documents"):

(a) *Loan Agreement* dated March 16, 2022, by and between the Debtor, as borrower, and UTB, as lender (the "Loan Agreement") **[Ex. A]**;

(b) *Promissory Note* dated March 16, 2022, by the Debtor, as borrower, payable to UTB, as lender, in the original principal amount of $25,000,000 (the "Note") **[Ex. B]**;

(c) *Deed of Trust, Security Agreement, Assignment of Rents, Fixture Filing, and Financing Statement* dated March 16, 2022, by and between the Debtor, as grantor, Philip D. Collins, as trustee, and UTB, as beneficiary, filed of record in the Dallas County Real Property Records on March 18, 2022 [Document #202200075735] (the "Deed of Trust") **[Ex. C]**;

(d) *Pledge and Security Agreement* dated March 16, 2022, by and between the Debtor, as pledgor, and UTB, as secured party (the "Security Agreement") **[Ex. D]**; and

---

[1] *See* Dallas County Real Property Records, *Special Warranty Deed* recorded Nov. 9, 2020 [Doc #202000310429].

(e) *Guaranty Agreement* dated March 16, 2022, by and between UTB, as lender, the Debtor, as borrower, and Atul Lucky Chopra, as guarantor (the "Guaranty Agreement") **[Ex. E]**.

13. Dr. Atul Lucky Chopra ("Chopra" or "Guarantor") unconditionally and irrevocably guaranteed the Debtor's Loan obligations to UTB, pursuant to the Guaranty Agreement.

14. Under the terms of the Loan, the Debtor agreed—starting April 16, 2022, and continuing on the 16th day of each month thereafter until February 16, 2042—to make monthly principal and interest payments on the Loan as set forth in Article II of the Loan Agreement. The Debtor further agreed to refrain from permitting the existence of any lien upon the Property.

15. The Debtor breached its obligations under the Loan Documents prior to the Petition Date by failing to pay certain real property taxes due on the Property, resulting in ad valorem tax liens, and by failing to cure mechanics' liens filed against the Property—thereby establishing two separate events of default under the Loan Documents.

16. On March 8, 2024, UTB accelerated the Note and made demand on the Debtor (and Chopra, as Guarantor) for payment of all remaining amounts due and payable under the Loan Documents. UTB thereafter posted the Property for foreclosure, with the foreclosure sale set to occur on April 2, 2024. The Debtor precluded UTB from moving forward with the foreclosure by filing this bankruptcy case the day before the sale.

17. As of the Petition Date, the total amount due and owing to UTB under the Loan Documents is at least $20,730,063.44, exclusive of certain legal fees incurred by UTB. The Debtor's Schedules list UTB as holding a non-contingent, liquidated, undisputed secured claim for a similar amount, with UTB's lien being described as "purchase money security."

**B. DEBTOR'S MASTER LEASE TO INSIDER TENANT**

18. Immediately upon acquiring the Property in November 2020, the Debtor leased the entire Property—all 199,182 square feet of the eight-story office building and the three-level

parking garage—to Advanced Dallas Hospital & Clinics, LLC ("Tenant"), pursuant to the Commercial Lease attached hereto as **Exhibit F** (the "Master Lease").

19. On March 16, 2022, in connection with the Loan, the Debtor, Tenant, and UTB entered into the *Subordination, Non-Disturbance and Attornment Agreement* attached hereto as **Exhibit G** (the "SNDA"). Chopra signed the SNDA on behalf of both the Debtor and the Tenant.

20. Importantly, Tenant is an insider of the Debtor within the meaning of section 101(31) of the Bankruptcy Code, because the same person, Dr. Chopra, owns and controls more than 20% of the voting interests in each entity. *See* 11 U.S.C. §§ 101(2) and 101(31)(E). The Debtor and Tenant are affiliate entities in that both are controlled by Chopra. The following screenshots of the SNDA explain the insider-affiliate relationship between the two entities:[2]

```
LANDLORD:

WALNUT HILLS – GREENVILLE AVE, LLC

By:  Cognizant Management Solutions, LLC,
     its sole manager

     By:  Zoo Capital Holdings, LLC,
          its sole member

          By: _____
              Atul Chopra
              President
```

```
TENANT:

ADVANCED DALLAS HOSPITAL & CLINICS,
LLC

By:  Cognizant Management Solutions, LLC,
     its sole manager

     By:  Zoo Capital Holdings, LLC,
          its sole member

          By: _____
              Atul Chopra
              President
```

SNDA, p. 10-11. The Debtor and Tenant also have the same registered agent and registered agent service address.[3]

---

[2] Cognizant Management Solutions, LLC ("Cognizant Management") is the sole manager of the Debtor and Tenant; Zoo Capital Holdings, LLC ("Zoo Capital") is the sole member of Cognizant Management; and Chopra is the sole member and manager of Zoo Capital. *See* **Ex. F**, SNDA p. 10-11. This is corroborated by the Certificates of Formation and 2023 Public Information Reports filed with the Texas Secretary of State for each entity (collectively, the "TXSOS Filings"). The TXSOS Filings for the Debtor, Tenant, Cognizant Management, and Zoo Capital are attached hereto as **Exhibits H – K**, respectively. Additionally, Zoo Capital is listed in the SOFA as being the 100% owner of the Debtor. *See* Dkt. No. 17, SOFA #28.

[3] *See* **Exs. H – K**, TXSOS Filings.

21. The Debtor and Tenant are each controlled solely by Cognizant Management, which is solely controlled by Zoo Capital, which is solely controlled by Chopra—the Guarantor under the Loan Documents. Additionally, on information and belief, Chopra is indirectly the sole owner of the Debtor and Tenant; otherwise, he would have no incentive to personally guarantee the Debtor's $25 million Loan obligation to UTB. Chopra represented to UTB that he would personally benefit from the Loan, indicating that he owns a personal stake in the Debtor.[4]

22. The Master Lease is a "triple net" lease requiring Tenant to pay base rent of $290,474.00 per month, plus all taxes, utilities, and insurance for the Property.

23. The term of the Master Lease commenced on December 1, 2020; however, Tenant's income statement reflects that Tenant did not pay any rent to the Debtor until January 2023. Tenant's income statement for the years 2020 through 2023 is attached hereto as **Exhibit L**.

24. Moreover, Tenant's income statement shows that, except for $108,057 in November 2023, no rent was paid to the Debtor for the months of September 2023 through December 2023. The Debtor's income statement, however, shows that the Debtor collected full base rent of $290,474 each month during that four-month period. The Debtor's income statement [Dkt. No. 4] is attached hereto as **Exhibit M**. Notably, the Debtor's income statement and the Tenant's income statement were both prepared by the same CPA.

25. Furthermore, in addition to the troubling insider issues, neither the Debtor nor Tenant has paid ad valorem taxes on the Property in at least two years. The Debtor's Schedules reflect that Dallas County is owed $2,923,660.38 for unpaid ad valorem taxes as of the Petition

---

[4] *See* **Ex. E**, Guaranty Agreement ¶7(d) ("Guarantor represents and warrants to Lender as follows: … (d) The value of the consideration received and to be received by Guarantor as a result of Borrower and Lender entering into the Loan Agreement and Guarantor executing and delivering this Guaranty Agreement is reasonably worth at least as much as the liability and obligation of Guarantor hereunder, and such liability and obligation and the Loan Agreement have benefitted and may reasonably be expected to benefit Guarantor directly or indirectly.").

10742062 v1 (76710.00040.000)

Date. Dallas County filed a tax lawsuit against the Debtor on January 22, 2024. *See* Dkt. No. 17, SOFA #7.

## REQUEST FOR RELIEF

26. Pursuant to section 1104(c) of the Bankruptcy Code and Bankruptcy Rule 2007.1(a), UTB hereby requests entry of an order authorizing and directing the appointment of an examiner to investigate and report on, among other things:

> (a) operation of the Debtor's business;
>
> (b) collection of rent under all leases, including the Master Lease;
>
> (c) the veracity of the Debtor's financial reports and books and records, and the disparities between Debtor's and Tenant's records with respect to the Master Lease;
>
> (d) Debtor's failure to pay ad valorem taxes for the Property, despite realizing nearly $1.9 million of net income in 2023;
>
> (e) potential payments to insiders of the Debtor; and
>
> (f) any other matters related the Debtor's ongoing operations and administration of the estate.

## BASIS FOR RELIEF

27. Section 1104(c) of the Bankruptcy Code governs the appointment of an examiner in Chapter 11 proceedings. The statute provides that:

> (c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
> > (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
> >
> > (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

28. Accordingly, section 1104(c) of the Bankruptcy Code requires the Court to appoint an examiner if:

    (a)    no trustee has been appointed;

    (b)    no plan has been confirmed;

    (c)    a party in interest or the US Trustee has requested an examiner; and

    (d)    either:

        (i)    the appointment of the examiner is in the best interests of creditors, interest holders, or the estate; or

        (ii)    the debtor's fixed, liquidated, and unsecured debts to non-insiders exceed $5 million.

*See e.g.*, *In re UAL Corp.*, 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004) ("[A]ppointment of an examiner is mandatory if the four conditions are met, but the court retains the discretion to determine the nature and scope of the examiner's investigation").

29. Here, there can be no dispute that the first three factors are satisfied. As to the last factor, the appointment of an examiner is warranted in this case for the best interests of creditors and other interests of the estate. Additionally, if it is determined that the Debtor's unsecured debts meet the $5 million requirement of subsection (c)(2), appointment of an examiner is mandatory.

**A.    APPOINTMENT OF AN EXAMINER IS IN THE BEST INTERESTS OF CREDITORS UNDER SECTION 1104(C)(1)**

30. The appointment of an examiner is in this case required because such appointment is "in the best interests of creditors, any equity security holders, and other interests of the estate" pursuant to section 1104(c)(1) of the Bankruptcy Code. The appointment of an examiner is in the best interests of creditors where "such appointment allows for a thorough, independent, and expeditious examination to be made into serious allegations." *In re JNL Funding Corp.*, 2010 WL 3448221, at *3 (Bankr. E.D.N.Y. Aug. 26, 2010).

31.     There is a clear disconnect in this case between the rental revenue the Debtor claims to be receiving and the rent that the insider Tenant purports to be paying. The disparities between the Debtor's and Tenant's financial statements, and the insider relationship between the parties, justify the appointment of an examiner in this case. *See, e.g.*, *In re 1243 20th St., Inc.*, 6 B.R. 683, 686 (Bankr. D.D.C. 1980) (stating that "the appointment of an examiner is warranted whenever allegations of corporate fraud or misconduct are substantiated by credible evidence[,]" and finding that examiner was warranted given that the transactions in question involved an affiliate under common management with the debtor); *In re Keene Corp.*, 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994) (quoting M. Bienenstock, Bankruptcy Reorganization 299 (1987)) ("Often, appointment of an examiner is warranted when the debtor's transactions with affiliates should be investigated."). An independent third-party examiner is needed to investigate the veracity of the Debtor's books and records and financial statements, whether subtenants are paying rents as required, rents paid or owed by the Tenant, and whether rents or other assets have been diverted to insiders or otherwise misappropriated, among other things.

32.     Moreover, the Debtor has not been paying ad valorem taxes on the Property for at least two years, despite having ample funds to do so. The Debtor's income statement reflects approximately $1.9 million of net income in 2023, *see* **Ex. M**, yet the Debtor is so delinquent on ad valorem taxes that Dallas County has filed a tax lawsuit against it, *see* Dkt. No. 17, SOFA #7. The Debtor's failure to pay ad valorem taxes and imposition of tax liens against the Property directly diminishes the value of UTB's collateral, because statutory tax liens take priority over UTB's first-lien Deed of Trust under Texas law. TEX. TAX CODE §§ 32.01(d), 32.05(b); *see also In re Monroe Park*, 17 B.R. 934, 939 (D. Del. 1982) (unpaid property taxes erode the value of a lender's secured interests because such amounts are superior to the lender's lien); *In re Vita Craft*

10742062 v1 (76710.00040.000)

*Corp.*, 625 B.R. 491, 504 (Bankr. D. Kan. 2020) (creditor was not adequately protected in light of debtor's failure to pay or escrow for property taxes, and deteriorating condition of property).

33. Having an independent third party conduct an investigation as proposed in this Motion and provide a report which would include an assessment of the viability of any possible claims would save estate funds in that the examiner may be ordered to share any documents or other materials disclosed in the examiner's report, thus potentially reducing expenses of having various parties conducting the same discovery in this case.

B. APPOINTMENT OF AN EXAMINER IS MANDATORY UNDER SECTION 1104(C)(2)

34. The appointment of an examiner under section 1104(c)(2) of the Bankruptcy Code is mandatory if the $5,000,000 debt threshold is met. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500-01 (6th Cir. 1990); *see also Loral Stockholders Protective Comm. v. Loral Space & Commc'ns, Ltd. (In re Loral Space & Commc'ns, Ltd.)*, 2004 WL 2979785, at *5 (S.D.N.Y. Dec. 23, 2004) (recognizing majority view that section 1104(c)(2) is mandatory not discretionary); *In re Erickson Ret. Cmtys., Inc., LLC*, 425 B.R. 309, 312 (Bankr. N.D. Tex. 2010) ("[W]here the $5 million unsecured debt threshold is met, a bankruptcy court ordinarily has no discretion" not to appoint an examiner); *In re UAL Corp.*, 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004) (holding that the language of section 1104(c)(2) requires appointment of an examiner, but court retains discretion to determine nature and scope of examiner's investigation).

35. Where the circumstances set forth in section 1104(c)(2) are present, the plain language of the statute requires the appointment of an examiner. *See In re Revco D.S., Inc.*, 898 F.2d at 500-01; *In re Loral Space & Commc'ns, Ltd.*, 2004 WL 2979785, at *5; *In re UAL Corp.*, 307 B.R. at 86; *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of

statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning").

36. Section 1104(c)(2) states that the court "shall" order the appointment of an examiner if certain conditions are met. The term "shall" is generally mandatory and leaves no room for a court to exercise discretion. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("the mandatory 'shall' … normally creates an obligation impervious to judicial discretion"); *see also Bell Atl.-N.J., Inc. v. Tate*, 962 F. Supp. 608, 616 n.6 (D. N.J. 1997) ("The word 'shall' when utilized in laws, directives, and the like, means 'must' or 'is or are obligated to'"); *Williamsport Sanitary Auth. v. Train*, 464 F. Supp. 768, 772 n.1 (M.D. Pa. 1979) ("[u]se of the word 'shall' connotes a mandatory intent"). In addition, if the plain language of a statute is unambiguous, there is generally no need to look to administrative interpretations or to legislative history to interpret the meaning of the statute. *See Magic Rests. Inc. v. Bowie Produce Co. (In re Magic Rests., Inc.)*, 205 F.3d 108, 114 (3d Cir. 2000); *see also Patterson v. Shumate*, 504 U.S. 753, 761 (1992); *Toibb v. Radloff*, 501 U.S. 157, 162 (1991).

37. The Court has not appointed a trustee in this case, and no plan has been confirmed (indeed, no plan has been filed). Accordingly, if it is determined that the Debtor's "fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000," then appointment of an examiner is mandatory under section 1104(c)(2).

## **NOTICE**

38. UTB will provide notice of this Motion to all parties listed on the attached creditor matrix, including (a) the Debtor; (b) counsel to the Debtor; (c) the U.S. Trustee; (d) all creditors listed on the Schedules; and (e) all parties that have filed a notice of appearance and request for

service in this proceeding of papers pursuant to Bankruptcy Rule 2002. Considering the nature of the relief requested, UTB submits that no other or further notice is necessary.

## NO PRIOR REQUEST

39. No prior request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

40. WHEREFORE, for the foregoing reasons, UTB respectfully requests that this Court enter an order, substantially in the form attached hereto, directing that a disinterested person be appointed as examiner in this Chapter 11 case, pursuant to section 1104(c) of the Bankruptcy Code and Bankruptcy Rule 2007.1(a), and that UTB be granted such other and further relief as is just and proper.

10742062 v1 (76710.00040.000)

DATED: July 10, 2024	Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By: */s/ Michael P. Ridulfo*
    **Michael P. Ridulfo**
    State Bar No. 16902020
    **William Hotze**
    State Bar No. 24087754
    5151 San Felipe, Suite 800
    Houston, Texas 77056
    Tel.: (713) 425-7400
    Fax: (713) 425-7700
    Email: whotze@krcl.com

    **John J. Kane**
    State Bar No. 24066794
    **Kyle Woodard**
    State Bar No. 24102661
    901 Main Street, Suite 5200
    Dallas, Texas 75202
    Tel.: (214) 777-4200
    Fax: (214) 777-4299
    Email: jkane@krcl.com
    Email: kwoodard@krcl.com

*Counsel for United Texas Bank*

## **CERTIFICATE OF CONFERENCE**

This is to certify that on July 5, 2024, the undersigned contacted Debtor's counsel to confer with respect to this Motion.  To date, no response has been received.

    */s/ Michael P. Ridulfo*
    Michael P. Ridulfo

10742062 v1 (76710.00040.000)

**CERTIFICATE OF SERVICE**

  This is to certify that on July 10, 2024, a true and correct copy of the foregoing notice was filed with the Court and served (i) via the Court's CM/ECF notification system upon all parties registered to receive such electronic notices in this case and (ii) via first-class mail, postage prepaid, upon all parties on the attached Service List.

                */s/ Michael P. Ridulfo*
                Michael P. Ridulfo

10742062 v1 (76710.00040.000)